IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. Hope Capriola, Amber Mason, Nadia Yamashita, Sonia Macias, and Aubrey Priest, | 1:11 – CV - 00135 AWI GSA |
| Relators, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** |
| v. | (DOC. 44) |
| BRIGHTSTAR EDUCATION GROUP, INC., a Delaware Corporation; INSTITUTE OF TECHNOLOGY, INC., a Delaware Corporation, and Does 1 through 500, inclusive. | |
| Defendant. | |

## INTRODUCTION

Relators Hope Capriola, Amber Mason, Nadia Yamashita, Sonia Macias, and

Aubrey Priest, (hereinafter referred to collectively as "Relators") on behalf of United

States Government, bring the instant *qui tam* action for damages and civil penalties

against defendants Brightstar Education Group Inc., (hereinafter referred to as

"Brightstar") and Institute of Technology, Inc., (hereinafter referred to as "IOT") arising

-1-

from an alleged violation of the False Claims Act ("FCA"). Relators allege that IOT submitted false claims for federal student financial aid funds to the United States Department of Education pursuant to the Higher Education Act, Title IV ("HEA") from at least November 2004 to the present. Specifically, Relators allege a violation of 31 U.S.C. Sections 3729(a)(1-2). (Current version at 31 U.S.C. § 3729(a)(1)(A-B)).

The court is now asked to rule on Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure Rules 12(b)(6) and 9(b).

## FACTUAL AND PROCEDURAL BACKGROUND

Relators are a group of persons formerly employed at the IOT Clovis campus as admissions representatives and Career Services Advisors (hereinafter referred to as "CSAs") in various periods between February 2009 and March 2011. (Second Amended Complaint ("SAC") ¶¶ 22, 27.)[1] On January 26, 2011, Relators initially brought suit in the court. On March 30, 2012 the United States gave notice of its election to decline intervention. Since the date of the Government's refusal to intervene, Relators have twice amended their complaint with leave from the court, the most recent of which was filed on August 29, 2012.

Relators allege that from at least November 2004 to the present, Defendants approved and presented false claims seeking over $38,000,000.00 annually from the Department of Education pursuant to the Higher Education Act. (Hereinafter referred to as "HEA") The two allegedly fraudulent assertions made by Defendants were contained

---

[1] Unless otherwise noted, all factual background information is taken from the Second Amended Complaint's factual allegations.

in the Program Participation Agreement (hereinafter referred to as "PPA") which was required to be eligible for funds under the HEA. The allegedly fraudulent portions of the PPA read as follows:

> a. "In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment-(i)[t]he most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements..." HEA § 487(a)(8)(A); 20 U.S.C. § 1094(a)(8)(A); 34 C.F.R. § 668.14(b)(10)(i); and
>
> b. "[The institution] *will not* provide any commission, bonus, or other incentive program based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds..." HEA § 487(a)(20); 20 U.S.C. § 1094(a)(20); 34 C.F.R § 668.14(b)(22)(i).

(SAC ¶ 2.)

Relators claim that, contrary to promises made in Defendants' PPA, Defendants in fact (a) provided knowingly false statistics, namely false placement rates, in support of their active – oral and written – advertisement, (SAC ¶ 3; see also Exhibit B) and (b) "regularly sponsore[d] competitions among enrollment counselors and financial advisors that are [/ were] based solely on the number of students these employees are able to enroll." (SAC ¶ 4.)

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Fed. Rule Civ. Proc. 12(b)(6), all allegations of material fact must be accepted as true and construed in the

light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Fed. Rule Civ. Proc. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (internal citations and quotations omitted). Though "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 1964-65 (internal citations and quotations omitted). A plaintiff's factual allegations must be enough to raise a right to relief above the speculative level. *Id*. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must contain something more...than...a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

Moreover, "Rule 8(a)(2)...requires a 'showing,' rather than a blanket assertion of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Twombly*, at 1965, n.3 (internal citations omitted). A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 1960; see also *Ashcroft v. Iqbal*, 556 U.S. 662, 677-678 (2009). If the "plaintiffs...have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly, at 1974.*

Claims brought pursuant to the False Claims Act are subject to heightened

pleading requirements. Fed.R.Civ.P. 9(b); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4*

*Sys., Inc.,* 637 F.3d 1047, 1054–55 (9th Cir. 2011). In alleging fraud or mistake, Rule

9(b) requires a party to "state with particularity the circumstances constituting fraud or

mistake," including "the who, what, when, where, and how of the misconduct charged."

*Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation

marks omitted). In addition, "'[t]he plaintiff must set forth what is false or misleading

about a statement, and why it is false.'" *Id.* (quoting *Decker v. GlenFed, Inc. (In re*

*GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)).

While a plaintiff need not provide "representative examples of false claims to

support every allegation," he must at least allege "particular details of a scheme to submit

false claims paired with reliable indicia that lead to a strong inference that claims were

actually submitted." *Ebeid ex rel. U.S. Lungwitz,* 616 F.3d 993, 998–99 (9th Cir. 2010)

(quotation marks omitted); *see also United States ex rel. Lee v. SmithKline Beecham,*

*Inc.,* 245 F.3d 1048, 1051–52 (9th Cir. 2001) (explaining that Rule 9(b) requires that a

complaint be "specific enough to give defendants notice of the particular misconduct

which is alleged to constitute the fraud charged so that they can defend against the charge

and not just deny that they have done anything wrong" (quotation marks omitted)).

If a Rule 12(b)(6) motion to dismiss is granted, claims may be dismissed with or

without prejudice, and with or without leave to amend. Generally, in dismissals for

failure to state a claim, a district court should grant leave to amend even if no request to

amend the pleading was made unless it determines that the pleading could not possibly be

cured by the allegation of other facts. *Enriquez v. Aurora Loan Services, LLC*, 11-16864, 2013 WL 572834 (9th Cir. Feb. 15, 2013); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).  In other words, dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment. *Muller v. Auker*, 700 F.3d 1180, 1191 (9th Cir. 2012);  *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

**DISCUSSION**

**A. Standing**

A *qui tam* plaintiff may bring suit pursuant to 31 U.S.C. § 3730(b)(1). The qui tam plaintiffs are permitted to carry the suit forward even when the government declines to intervene. 31 U.S.C. § 3730(c)(3). (see also *U.S. Ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001). Here, Relators have elected to move forward with the proceeding despite the government's declination to intervene. Relators have standing.

**B. False Claims Act Liability**

Relators allege causes of action based on violations of 31 U.S.C. § 3729(a)(1)(A-B). The FCA sections pled by Relators attach liability to any person who:

> (A)  knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ;

31 U.S.C. § 3729(a)(1)(A-B, G)

1. False Certification Theory

The Ninth Circuit has recognized false certification as a means by which the FCA can be violated. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266-1267 (9th Cir. 1996).

Under a false certification theory the essential elements of False Claims Act liability are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, [submitted in a claim to] (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)

Further, the Ninth Circuit has recognized two variations for finding liability under the FCA based upon a false certification theory. First, the court can find liability where there is an express false certification. An express false certification is present simply when an entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998. (9th Cir. 2010). In contrast, implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule or regulation, and that obligation is implicated by submitting a claim for payment even though a renewed certification of compliance is not required in the process of submitting the claim. *Id.* The submission of a claim for payment acts as an implicit reaffirmation of compliance. In either situation it is the false certification of compliance which creates liability when that certification is a prerequisite to obtaining the government benefit. *Id.* (citing *Anton*, 91 F.3d at 1266.)

To meet Fed. Rule Civ. Proc. 9(b), a complaint alleging implied false certification must satisfy the general elements of FCA liability and plead with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment

and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

Here, Relators assert that IOT entered into a program participation agreement with the department of education promising to comply with the regulations governing compensation of enrollment counselors as well as the advertising of placement rates. (SAC ¶ 55.) IOT is alleged to have falsely made the certifications and to have continued to violate the provisions. (*Id.*) Further, Relators allege that IOT annually falsely asserts compliance with the incentive compensation ban in submitting "management assertion letters" for yearly compliance audits. (SAC ¶ 56.) Based on these certifications IOT submits applications for Pell Grants to the Department of Education. (SAC ¶ 58.) These requests are not alleged to include additional certifications of compliance with the terms of the PPA. Rather, Relators allege that the claim is fraudulent because IOT knowingly submits claims that it is ineligible for due to the intentional violations of the PPA. (SAC ¶ 59.) The claims submitted for Pell Grants are appropriately construed as implied false certifications because they rely on the previous express affirmations of compliance with the PPA.

Relators allege that IOT requests government-insured loans.(SAC ¶ 60.) Only students who attend eligible Title IV schools may receive Title IV government-insured loans. (*id.*) The IOT loan requests include an express certification by IOT that the student is an eligible student under the Title IV program. (*Id*). The students are alleged to be ineligible for Title IV funds because IOT is not an eligible Title IV school due to its

violations of the HEA and the PPA. (*id.*) The claims submitted for government-insured loans are appropriately construed as express false certifications because they rely on an express false certification of compliance every time a claim for payment is submitted.

a.   *False Statement or Fraudulent Course of Conduct.*

Relators allege two false statements by Defendants. First, Relators assert that defendant IOT undertook to provide potential students with employment placement information of prior students based on patently false placement statistics in violation of the PPA signed by IOT. (SAC ¶ 27; 20 U.S.C. 1094(a)(8).) In doing so, IOT failed to provide the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements, in violation of the 20 U.S.C. § 1094(a)(8)(A).

The complaint specifies with particularity numerous ways in which IOT recorded false statistics. Relators claim that IOT, contrary to their representations that prior students were only considered "placed" when they utilize the core skills learned in the program, were actually recorded as placed when they had any job. (SAC ¶ 31.) Further, Relators allege that IOT policy provided that prior students could be recorded as placed even if they had gained employment in the same position that they had prior to their IOT education or had not graduated. (SAC ¶¶ 33, 35.) Accordingly, IOT counts non-graduates who have a job as "placed" yet do not count non-graduates who are not placed when compiling placement rates, distorting placement statistics. (SAC ¶ 34.) Although the advertisements dispersed by IOT indicated that the school would only consider a student placed if they found a job within six months of graduation it was common for CSAs to

consider a person placed if they found employment years after graduation (SAC ¶ 35.) Relators also allege that IOT CSAs were instructed to encourage graduates to obtain business licenses or business cards under the guise of making them more marketable. Relators allege that in actually this policy was advanced in order to identify the graduate as "self employed" for placement purposes even when the graduate earned no income through the purported self employment. (SAC ¶ 37.)

The complaint alleges that IOT, in a faux effort at transparency, created a position for a "third party" verification service to ensure that the placements made by CSAs are accurate. (SAC ¶ 41.) In fact, the role is performed by a former IOT student who is employed by BrightStar. (*Id.*) Relators contend that, in performing the audits of the CSA placements, it should have been clear to the auditor that up to twenty-five percent placements made by CSAs consisted of present students who had yet to graduate, numerous students who were falsely listed as self-employed, and many students who listed employers and employment positions that did not utilize the core skills learned in the program as required. (SAC ¶ 42.)

Second, 20 U.S.C. § 1094(a)(20) forbids an institution from providing a "commission, bonus, or incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons … engaged in any student recruiting or admissions activities…." Relators assert that defendant IOT certified compliance with this provision when it entered into a PPA with DOE. (SAC ¶ 2.)

Relators assert that IOT violated the incentive compensation ban present in the PPA by allowing weekly and annual competitions among the Admissions Representatives

where the representatives with the highest number of enrollments would receive prizes. (SAC ¶¶ 43-44.) Similar competitions were allegedly held for Financial Aid Advisors who were rewarded according to the conversion ratio of students seeking aid who ended up enrolling at IOT. (SAC ¶¶ 45.) Relators assert that BrightStar sponsored and funded the competitions among the Admissions Representatives in order to conceal violations of the incentive compensation ban. (SAC ¶ 44.)

Relators named specific officers of IOT who instructed Relators to implement the fraudulent policies in question, (SAC ¶¶ 31, 33, 36, 37, 40.) described the types of fraud carried out and gave examples to support their assertions, (SAC ¶¶ 31-42, 44.) and referred to regular meetings between IOT and BrightStar officers and Relators. (SAC ¶¶ 31, 33, 36, 37, 40, 47.)

*b.  Scienter*

31 U.S.C. § 3729(a)(1)(A-B) require that an individual act "knowingly" in presenting, causing to be presented a false claim, or making, using or causing to be used a false record or statement. 31 U.S.C. § 3729(a)(1)(A-B). Scienter requires knowledge of the falsity with the intent to deceive. *Hopper,* 91 F.3d at 1265. Specifically, the FCA requires actual knowledge of the information and either an act in deliberate ignorance or in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)(i-iii).

Relators assert that "defendants have, and continue to have, actual knowledge that they are not complying with the PPA or the[] underlying Federal Regulations and that their representations of adherence to those regulations were and are false." (SAC ¶ 3.)

Relators further pled that Brightstar and IOT managerial staff expressly relayed policies designed to misrepresent placement numbers to CSAs in violation of the PPA. (SAC ¶¶ 29, 31, 33, 36, 37, 40.) Regarding the placement figures recorded by CSAs, IOT claims they have been verified by a third party verification service. (SAC ¶ 41.) The verification service in question is employed by BrightStar "and had to have known the vast majority of IOT placements were fraudulent since his job was supposedly to verify every placement. (SAC ¶ 42.) (quotes omitted) Relators draw the logical conclusion that based on rising unemployment and a high incidence of student loan defaults from IOT students that IOT must have known that the purported 70% placement rate was fraudulently achieved. (SAC ¶ 42.)

Regarding compensation, Relators further allege that BrightStar sponsored "competitions" among Admission Representatives, wherein the representative with the highest number of enrollments would receive prizes. (SAC ¶ 44.) Relators allege that the competitions and nature of the third party verification service were concealed the alleged fraudulent placements and prohibited incentives. (SAC ¶¶ 42, 44.) Relators allege that the CEO of BrightStar, Vice President of Operations of BrightStar, and President of IOT were all informed of the enrollment of unqualified student due to the pressure on Admissions Representatives and Financial Aid Advisors created by the competitions yet did nothing to remedy the problem. (SAC ¶ 47.)

Relators assert that these competitions led to students being enrolled who could not benefit from the programs offered; the exact harm that the 20 U.S.C. § 1094(a)(20) seeks to avoid. *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1168-1169;

citing *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. Oct. 20, 2005). Relators allege that Relator Nadia Yamashita eventually brought this concern to CEO of Bright Star, Jim Haga, Vice President of Operations for BrightStar, Todd Lardernoit, and President of IOT, Joe Haydock. Ms. Yamashita's concerns went unanswered, she was directed not to worry about student qualifications and no policy changes were implemented. (SAC ¶ 47.)

Contrary to Defendants' claim that plaintiff alleged no facts from which an inference of scienter could be drawn, Relators have alleged sufficient fact and concluded from the facts alleged that "IOT knows it is ineligible for [Pell Grants and federally-insured loans] because of its intentional violations of the HEA and its PPA."

Relators' allegation that Defendants acted with knowledge and intent to deceive is sufficient to meet Rule 9(b)'s requirement since scienter may be alleged generally.

*c. Materiality*

To establish the materiality element, the false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant. Materiality hinges on whether the false certification, assertion, or statement was relevant to the government's decision to confer a benefit. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010). In order for an educational institution to be eligible to receive federal funds pursuant to Chapter 34 of Title 42 the institution must enter into a program participation agreement. 20 U.S.C. § 1094(a). The agreement shall condition the initial and continuing eligibility of an institution. *Id.*

An institution may participate in any Title IV, HEA program … *only if* the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation agreement conditions the *initial and continued* participation of an eligible institution in any Title IV, HEA program *upon compliance* with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.

34 C.F.R. § 668.14(a)(1)(emphasis added).

In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment--

(i) The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements;

34 C.F.R. § 668.14(b)(10)(i)

[The educational institution] will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds.

34 C.F.R. § 668.14(b)(22)(i).

Relators allege that the Program Participation Agreement explicitly states:

The execution of this Agreement by the Institute and Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA program.

(SAC ¶ 51; PPA p. 1 of 13.)

The above sections demonstrate that compliance with the requirement that institutions make available correct data concerning job placement and enforce the incentive compensation ban are necessary conditions of continued participation and

eligibility. Accordingly, the asserted compliance with the requirements of the PPA was relevant to the government's decision to pay out money, as required by *Ebeid*.

In addition to the submission of the PPA, Relators assert that IOT submits "management assertion letters," written by IOT management for an annual compliance audits in order to qualify for HEA funds. (SAC ¶ 56.) The audit certifies compliance with the HEA incentive compensation ban. (*id.*) Without submission of the audit reasserting the allegedly false certifications IOT is ineligible for federal funds. Accordingly, the initial PPA and annual audit were material certifications without which no Title IV funds would have been dispensed to IOT.[2]

*d.  Claim*

Finally, Relators allege that IOT presents claims against the government in two primary ways, both of which directly mirror the claims in *Hendow* where the court found the claims asserted to be sufficient under Rule 9. *Hendow*, 461 F.3d at 1177.[3] First, Relators assert that IOT submits claims for Pell Grant funds directly to the Secretary of Education. As discussed above, the allegations in the complaint relating to the submission of the Pell Grant claims are properly interpreted as alleging an implied false certification cause of action because each claim does not contain an express certification of

---

[2] Defendant's argues that Relators plead that IOT provides placement statistics to students. (MTD at. 8) The court gives little weight to this claim because the paragraph in question was a precursor to Relators' contention that that the placement statistics provided to students were patently false. (SAC ¶ 27.)  20 U.S.C. § 1094(a)(8)(A) is intended to provide material to students to substantiate the truth of an institution's advertisement, not to reinforce misrepresentation.

[3] In *Hendow* plaintiffs alleged that University of Phoenix, after agreeing to the terms of a PPA, submitted claims for Pell Grants and federally-insured loans which contained false certifications of compliance with the incentive compensation ban.

compliance with the HEA or PPA. Again, the additional requirements for an implied

certification theory are that (1) the defendant explicitly undertook to comply with a law,

rule or regulation that is implicated in submitting a claim for payment and that (2) claims

were submitted (3) even though the defendant was not in compliance with that law, rule

or regulation.

Relators alleged that IOT entered into a PPA with the DOE that contained

allegedly false certifications (SAC ¶ 2.) They further alleged that after IOT entered into

the PPA that they submitted requests for Pell Grant funds. (SAC ¶ 58.) Finally, Relators

allege that "[w]hen IOT requests, receives, and retains the Pell Grant funds, IOT knows it

is ineligible for those funds because of its intentional violations of the [HEA] and the

term[s] of its PPA." (SAC ¶ 59.) Accordingly, the complaint is sufficient to satisfy Rule

9(b) as to the Pell Grant submission of claims element.

Second, IOT submits requests for government-insured loans. The claim is

submitted to the DOE or a private lender and expressly certifies that the student is

eligible under the Title IV program. (SAC ¶ 60.) This express certification as well as the

initial signing of the PPA and annual compliance audit are all required to be eligible to

receive government-insured loans.

Defendants argue that payment of government insured loans are not to be

considered claims against the government unless the loan falls into default, the Guarantee

Agency cannot collect from the defaulting student, and the government is forced to make

good on the loan guarantee. In *U.S. ex rel. Hendow v. University of Phoenix*, UOP

submitted a largely identical claim for government-insured loans. *U.S. ex rel. Hendow v.*

*University of Phoenix*, 461 F.3d at. 1177. There, the court held that the government insured loans constituted causing "the government to pay out money or forfeit moneys due." *Id.* (internal quotations omitted.) In any case, the government pays all interest on the insured loans while the students are enrolled in classes. (SAC ¶ 62.) The government is thereby immediately paying out money based on the federally-insured loan applications.

Defendant's reliance on *U.S. v Rivera* for the proposition that the government must actually make a payment for Relators to have a claim pursuant to the false claims act is in error. Contrary to Defendants' position the court in *Rivera* specifically noted that the a party who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or suffer any loss. *U.S. v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995).  In fact, *Rivera* recognizes the congressional intent for the FCA to attack activity that presents a risk of wrongful payment rather than waiting for potential government harm to increase in perpetuity until the government is damaged by each falsely submitted claim. *U.S. v. Rivera,* 55 F.3d at 709-710.

Based on the foregoing, Relators have properly alleged that IOT submitted a claim for purposes of False Claims Act liability.

*e. Summary*

Relators alleged that IOT entered into a PPA with the DOE that contained the allegedly false certifications. (SAC ¶ 2.) They further alleged that after IOT entered into the PPA that they submitted requests for Pell Grant funds and government insured loans.

(SAC ¶¶ 58, 60.) Additionaly, Relators allege that " [w]hen IOT requests, receives, and retains the Pell Grant funds [and government-insured loans], IOT knows it is ineligible for those funds because of its intentional violations of the [HEA] and the term[s] of its PPA." (SAC ¶¶ 59, 61.) Relators asserts that the false certifications made in the PPA and annual compliance audits were material to the government's decision to pay out funds. (SAC ¶¶ 52, 56.) Accordingly, the complaint is sufficient to satisfy plead a violation of the False Claims Act based on false certification theory.

2. Scope

Defendant claims that since all five Relators worked at IOT's Clovis campus between February 2009 and March 2011, that they only have sufficient knowledge to allege facts pertaining to the Clovis campus from February 2009 to the present. (Defendants' Motion to Dismiss ("MTD") at 2.) As to the allegations of the complaint prior to February 2009, Relators make no mention of specific facts arising prior to 2009 aside from a single alleged false placement of a 2005 graduate from an IOT culinary arts program. Accordingly, this court will dismiss the portions of the first and second causes of action insofar as they allege a violation of the FCA prior to February 2009. The court will allow leave to amend with specific factual allegations on this ground.

As to the IOT campuses properly included in this suit, Relators allege that in order to be eligible for Title IV funds – specifically Pell Grants and federally-insured loans – that an institution must certify compliance to the HEA in a PPA as discussed above. *Infra sec. C(1)(c) Materiality.* The PPA attached to Relators' complaint specifically states that the agreement "applies to all locations of the Institution…" This fact combined with the

pled allegations of policy statements by IOT and BrightStar officers as well as Exhibits C (email from Vice-President of Operations for BrightStar, Todd Lardenoit, outlining the Brightstar Incentive Program) and D (BrightStar Admissions Incentive Catelog) which appear to address the entire IOT Career Services and Admissions Departments give rise to a reasonable inference that multiple IOT locations were involved with the false claims alleged in this action.

3. Parties

Defendants argue that group pleading is inadequate to satisfy Rule 9(b). (MTD at. 6.) They rely on *U.S. v. Corinthian College* where the court held, in the context of individual defendants, that a complaint may not merely lump together multiple defendants but requires plaintiffs to differentiate their allegations. *U.S. v. Corinthian Colleges*, 655 F.3d 984, 997-998 (9th Cir. 2012). Here, Relators have alleged particular conduct by the executive officers of both IOT and BrightStar. (SAC ¶¶ 23-25, 30, 31, 33, 36, 40, 42, 47.) Relators have not, however, alleged a cause of action that would allow this court to find BrightStar liable under the limited FCA subsections raised so far. (i.e. The facts as alleged do not clearly support a conclusion that BrightStar either presented or caused to be presented a false or fraudulent claim or knowingly made, used, or caused to be made or used a false record or statement.)[4] Only IOT is alleged to have signed the PPA and compliance audits and have submitted claims for funds to the government.

---

[4] It is unclear from the complaint whether the alleged "third party verifi[cation]" by BrightStar, alleged in the SAC, generated records submitted as part of a claim or annual compliance audit. (SAC ¶ 42.) Relators did not specifically allege that the third party verification by BrightStar constituted creation of a false record material to a false claim and this Court is unable to determine, based on the pleadings, whether the audits qualify under Section 3729(a)(1)(B).

(SAC ¶¶ 2, 56, 58, 60.) Accordingly, the first and second causes of action should be dismissed as to BrightStar. The court does not find that amendment would be futile because an additional cause of action could conceivably be pled as to BrightStar so it will grant Relators leave to amend.

## C. Conclusion

Accordingly, because relators in this case have properly alleged (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due, their cause of action under the False Claims Act survives a motion to dismiss.

### ORDER

Accordingly, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Relators state a claim for the first and second causes of action against IOT for all campuses for the period from February 2009 to the present.

Relators fail to state a claim in the first and second causes of action against BrightStar. Accordingly, claims against BrightStar are dismissed, without prejudice.

Relators fail to state a claim in the first and second causes of action against IOT from the period of 2004 to January 2009. Accordingly, claims for the period of 2004 to January 2009 are dismissed, without prejudice.

Relators are granted leave to amend within thirty (30) days of the entry of this order.

If no amended complaint is filed, IOT must file an answer within fifty (50) days of the entry of this order.

1

2

3

IT IS SO ORDERED.

4

Dated:   April 10, 2013

5

SENIOR  DISTRICT  JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28